IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Kaye Gosnell, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 7:07-4038-HMH |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| The United States Life Insurance | ) | |
| Company in the City of New York, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court for review of the claim administrator's decision to deny long-term disability benefits ("LTD") to Kaye Gosnell ("Gosnell") under a long-term disability ("LTD") plan (the "Plan") governed by ERISA.[1] The Plan is insured and administered by The United States Life Insurance Company in the City of New York ("USL").[2] Gosnell seeks benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) and attorney's fees and costs pursuant to 29 U.S.C. § 1132(g). (J.S. ¶ 1.) The parties have filed the Joint Stipulation and memoranda in support of judgment pursuant to the court's Specialized Case Management Order for ERISA benefits cases. For the reasons below, the court affirms USL's denial of LTD benefits.

---

[1] Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.

[2] Although the Plan language designates USL as the claims administrator, the record reveals, and the parties do not dispute, that Disability Reinsurance Management Services, Inc. ("Disability RMS") made every claim decision with respect to Gosnell's claim.

I. FACTUAL AND PROCEDURAL HISTORY

Gosnell was covered under the Plan through her employer, BMW Manufacturing Corporation ("BMW"). Gosnell was employed with BMW until February 21, 2006 (R. at 314.) When Gosnell took a leave of absence from her employment on February 21, 2006, the date she alleges she became disabled, she was a production associate at BMW. (Id. at 72; 428.) Gosnell's treating physician, Dr. Steven Hess ("Dr. Hess"), advised Gosnell to take a leave of absence at that time due primarily to bronchitis. (Id. at 552.) As a result of her illness and leave of absence, Gosnell filed a short-term disability benefits ("STD") claim on March 1, 2006. (Id. at 550.)

Shortly thereafter, Gosnell began experiencing hip pain and was initially examined by Dr. David Mitchell ("Dr. Mitchell") on March 17, 2006, and April 19, 2006. (Id. at 529-30.) Dr. Mitchell opined that Gosnell had possible degenerative disc disease and referred her to Dr. Martin Gillespie ("Dr. Gillespie"). (R. at 529-30.) On April 27, 2006, Dr. Gillespie noted progressive right-hip and low-back pain for one year and a past diagnosis of congenital spinal stenosis and L5-S1 radiculopathy. (Id. at 169.) Based on his examination, Dr. Gillespie's assessment was L5-S1 radiculopathy, possible right-hip labral tear, femoral acetabular impingement, and right-hip osteoarthritis. (Id. at 171.)

On June 23, 2006, Gosnell underwent right-hip arthroscopy. (Id. at 157.) She reported improvement at a follow-up exam on July 13, 2006. (Id. at 149.) Dr. Gillespie indicated that Gosnell should continue physical therapy and should be able to return to work after Labor Day of that year (2006). (R. at 151.)

Gosnell subsequently fell and saw Dr. Gillespie on September 21, 2006, for a hematoma on her right thigh. (Id. at 142.) Gosnell continued to report improvement, and Dr. Gillespie stated that she could return to work on November 1, 2006. (Id. at 142-44.)

On October 10, 2006, Gosnell visited Dr. Gillespie and reported increased right-hip pain. (Id. at 137.) An MRI of her spine revealed "some central stenosis . . . due to hypertrophic facets and an annular tear laterally on the left at L4-5." (Id.) The MRI of her hip was largely unremarkable. (R. at 137.) Dr. Gillespie noted that he explained to Gosnell that "her pain is out of proportion, and that she did real well for about six weeks and then started having increased pain, and it is difficult for me to explain." (Id. at 139.) On December 14, 2006, Dr. Gillespie stated that Gosnell could return to work on January 1, 2007, without restrictions. (Id. at 116.)

On December 19, 2006, Dr. Ken Hammond ("Dr. Hammond") of BMW Industrial Health Services evaluated Gosnell. (Id. at 348.) He indicated that Gosnell had completed five months of physical therapy and was not on any pain medications. (Id.) In addition, Gosnell stated that she felt like she could return to her regular job duties. (R. at 348.) On December 21, 2006, Gosnell reported that she was in no pain and was doing well. (Id. at 347.) She could also perform at a medium functional level without any discomfort or pain. (Id. at 347.) On February 5, 2006, Dr. Hammond found that Gosnell could return to work the following day, based on the examination, Gosnell's completion of a work hardening program, and her indication that she felt able to do her regular job. (Id. at 343.)

It is undisputed that Gosnell returned to work on February 6, 2007. (Id. at 341.) She continued working until May 22, 2007, when she stopped due to the same disability. (R. at 231.) Gosnell did not seek any medical treatment during this time period.

On May 24, 2007, Gosnell was examined by Dr. Hess, her family physician, because of back and leg pain. (Id. at 279.) Dr. Hess's assessment was sleep-related leg cramps, joint pain/arthralgia, and back pain. (Id. at 279.) He referred Gosnell to an orthopedist.

Gosnell saw Dr. Gillespie on May 29, 2007, and complained of right-hip pain and problems standing for prolonged periods of time. (Id. at 110.) Dr. Gillespie stated that she could return to work in a week, but could only perform sedentary duties. (Id. at 296.) In addition, Dr. Gillespie opined that she needed to consider a right-hip replacement. (R. at 296.)

Because Dr. Gillespie was relocating, he referred Gosnell to another orthopedist, Dr. Michael Funderburk ("Dr. Funderburk"). (Id. at 112.) Dr. Funderburk examined Gosnell on June 6, 2007. (Id. at 97.) He noted that her motion appeared "quite good," but that she reported experiencing pain at the end of the day after work and when "get[ting] up." (Id. at 98.) Dr. Funderburk prescribed Ultram for her pain. (Id. at 99.)

Gosnell had a rheumatology consultation on July 9, 2007, with Dr. James Halla ("Dr. Halla"). (R. at 87.) She complained of "right-groin pain, buttocks pain, TB area pain, coccyx area pain, and leg pain." (Id.) Dr. Halla opined that Gosnell likely suffered from soft tissue problems and could possibly have monosynovitis. (Id. at 89.)

Gosnell visited Dr. Funderburk again on July 25, 2007. (Id. at 85.) At this examination, Dr. Funderburk discussed surgical options with Gosnell, including a total hip replacement, but stated that these options should be avoided if at all possible. (Id. at 85.)

Dr. Halla performed a follow-up examination of Gosnell on July 30, 2007. (R. at 81.) Because a review of Gosnell's various x-rays appeared normal, Dr. Halla reiterated his opinion that Gosnell's pain originated from a soft tissue condition, namely/monosynovitis. (Id. at 82.)

Dr. Phillip Esce ("Dr. Esce"), of Spartanburg Neurosurgical Institute, examined Gosnell on July 3, 2007, and August 16, 2007. (Id. at 194-97.) In a report dated August 16, 2007, Dr. Esce reports that an MRI revealed "increased signal intensity on the T2 imaging" that "flares all along the sacrum to the coccygeal region." (Id. at 195.) Based on the MRI, Dr. Esce speculated that "some sort of myeloma process . . . or some other type of cancers" could be causing her pain." (Id.)

The Plan contains an elimination period of three hundred sixty-five days during which a claimant must be continuously disabled before becoming eligible to receive LTD. (R. at 3.) The Plan states that USL "will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. You can satisfy your elimination period if you are working provided you meet the definition of disability." (Id. at 7.) The Plan's definition of disability is as follows:

DISABILITY means [USL] has determined that:

1. You are unable to perform all the material and substantial duties of your regular occupation due to your sickness or injury; and

2. You have a 20% or more loss in monthly earnings due to the same sickness or injury.

(Id. at 4.)

In addition, the Plan provides for payments to an individual who has previously qualified for and received LTD payments under the Plan and who suffers from a recurrent disability. The Plan defines recurrent disability as "a period of disability that is . . . caused by a worsening in your condition; and due to the same cause(s) as your prior disability for which [USL] made a [LTD] payment." (Id. at 5.)

On February 19, 2007, Disability RMS initially denied Gosnell's claim on the ground that she did not meet the three hundred sixty-five day elimination period because she returned to work on February 6, 2007, prior to the eligibility date of February 21, 2007. (Id. at 330-31.) Gosnell states that she did not disagree with the initial denial until she had to stop working on May 22, 2007, allegedly due to the same disability. (Pl.'s Mem. Supp. J. 7.) She filed an appeal on June 13, 2007. (R. at 231.) Dr. Thomas Reeder ("Dr. Reeder"), an in-house physician for Disability RMS, reviewed Gosnell's claim, and issued a report on August 2, 2007. After reviewing her appeal, Disability RMS denied Gosnell's claim a second time on August 8, 2007, on the ground that she did not meet the elimination period. (Id. at 233-36.) On August 23, 2007, Gosnell filed a second appeal. (Id. at 221.) Disability RMS finally denied Gosnell's claim on December 1, 2007. (Id. at 37.) In its final denial letter, Disability RMS stated as follows:

> With regard to your client's contention that she met the 365 day elimination period, we conducted a financial review of the payroll records in your client's claim file to date. In summary of the financial review, your client would have met the elimination period as of March 11, 2007. Your client would have also had an earnings loss in March and April, but did not suffer an earnings loss in May 2007. It should be noted, however, because there is no support for any restrictions and/or limitations as of the date of disability and continuing, no benefits are payable. Therefore, we cannot consider any benefits. In addition, your client demonstrated her ability to work, and she did not seek any treatment between February and May when she was working. In addition, your client successfully completed work hardening with no complaints and demonstrated her ability to function at a medium capacity based on the results of the functional capacity evaluation.

(Id. at 38.)

## II. DISCUSSION OF LAW

The parties stipulate that the proper standard of review is de novo. (J.S. ¶ 3.) In conducting a de novo review, the court should look only at the evidence that was before the Plan

administrator or trustee at the time of the determination. See Quisenberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1025 (4th Cir. 1993). Furthermore, the parties stipulate that the court may dispose of this matter consistent with the submitted joint stipulation and the memoranda in support of judgment. (J.S. ¶ 8.)

Under this standard and based on the following, the court will not disturb the administrator's decision. It is undisputed that Gosnell returned to work on February 6, 2007. (R. at 341.) It is further undisputed that Gosnell continued working as a production associate at BMW until May 22, 2007. Nevertheless, Gosnell asserts that she did meet the elimination period requirement for the following reasons.

First, Gosnell argues that in its final denial letter, Disability RMS conceded that Gosnell met the elimination period requirement. (Pl.'s Reply Supp. J. 3.) For the same reason, Gosnell argues that USL has waived any right to rely on the elimination period requirement as the basis for denying Gosnell benefits. (Id. 4.) However, the court disagrees.

Contrary to Gosnell's assertion, the language of the final denial letter does not concede that Gosnell met the elimination period requirement. Significantly, the letter states that Gosnell "*would have* met the elimination period as of March 11, 2007." (R. at 38.) (Emphasis added.) The remainder of the paragraph explains that Gosnell, in fact, did not meet the elimination period because she failed to demonstrate a disability as of the alleged date of disability and continuing, and because she demonstrated her ability to work and did not seek any medical treatment between February and May 2007 when she returned to her position at BMW. (Id.) Therefore, the court finds that the Defendant has not conceded or waived the elimination period issue.

In addition, Gosnell asserts that although she returned to work, she was disabled during this time period. (Pl.'s Reply Supp. J. 8.) The Plan language envisions that a person can be considered disabled even though she is working. (R. at 7.) However, the court finds that Gosnell has failed to demonstrate that she was continuously disabled for the entire elimination period.

The evidence indicates that Gosnell was not unable to perform all the material and substantial duties of a production associate due to her sickness and injury for the entire elimination period, as required by the Plan. First, as stated above, Gosnell returned to work on February 6, 2007. (Id. at 341.) Her monthly earnings report indicates that from February 6, 2007, until February 24, 2007, she worked an average of over 39 hours per week, excluding ten hours of vacation time. (Id. at 67.) During the next two-week time period, from February 25, 2007, until March 10, 2007, she worked a total of 59.95 hours, excluding vacation time. (Id.) Gosnell asserts that her "sporadic" attendance during this period demonstrates that she was not able to perform the functions of her job. (Id. at 74.) However, her records indicate that she did, in fact, work a substantial number of hours before the expiration of the elimination period.

Further, Gosnell fails to demonstrate that any absences were due to her disability. Gosnell's treating physician, Dr. Gillespie stated that Gosnell could return to work on January 1, 2007, without restrictions, and on December 19, 2006, and February 5, 2007, Gosnell stated that she felt that she could return to her job. (R. at 116, 343, 348.) In addition, on February 5, 2006, Dr. Hammond found that Gosnell could return to work the following day, based on his examination, Gosnell's completion of a work hardening program, and her indication

that she felt able to do her regular job. (Id. at 343.) Finally, Gosnell did not seek any medical treatment during the time period.

Gosnell relies largely on the opinion of Dr. Funderburk that she has been disabled since February 2006 to demonstrate her disability during the time period from February 6, 2007, to May 22, 2007. However, Dr. Funderburk examined Gosnell for the first time on June 6, 2007, after the time period in question. (Id. at 97.) Given the fact that Gosnell returned to work during this time period after being released by her long-time treating physician and her own belief that she could return to work, Dr. Funderburk's opinion is not credible. Therefore, the court finds that Gosnell fails to demonstrate that she was continuously disabled for the entire elimination period.

Finally, to the extent Gosnell argues that the Plan's definition of recurrent disability encompasses her claim, the application of this provision only applies to a period of disability that is "due to the same cause(s) as your prior disability for which [USL] made a long term disability payment." (Id. at 5.) As the court finds that Gosnell is not entitled to LTD benefits because she did not meet the elimination requirement, her disability cannot be classified as a recurrent disability under the Plan. Based on the foregoing, the court affirms USL's decision to deny Gosnell benefits.

Therefore, it is

**ORDERED** that USL's decision to deny LTD benefits is affirmed.

**IT IS SO ORDERED**.

                                                s/Henry M. Herlong, Jr.
                                                United States District Judge

Greenville, South Carolina
May 29, 2008